FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 OCT -5 PM 12: 34

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

VINCENT POMPONI, Derivatively On
Behalf of NEWPARK RESOURCES, INC.,

                    Plaintiff,

    vs.

JAMES D. COLE, MATTHEW W.
HARDEY, DAVID P. HUNT, ALAN J.
KAUFMAN, JAMES H. STONE, ROGER C.
STULL, JERRY W. BOX, F. WALKER
TUCEI, JR., GARY L. WARREN,
WILLIAM T. BALLANTINE, R. MICHAEL
STILL, DIBO ATTAR, PHILIP S.
SASSOWER, LAWRENCE I. SCHNEIDER
and DAVID C. BALDWIN,

                    Defendants,

    - and -

NEWPARK RESOURCES, INC., a Delaware
corporation,

                    Nominal Defendant.

\* CIVIL ACTION NO.
\*
\* SECTION "   **06 - 7340**
\*
\* JUDGE
\*                **SECT. B MAG. 2**
\* MAG. DIV. (   )
\*
\* MAGISTRATE JUDGE
\*
\*
\*
\* **JURY TRIAL IS DEMANDED**
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF
THE SARBANES-OXLEY ACT OF 2002, SECTION 14(A) OF THE SECURITIES
EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST
ENRICHMENT, ACCOUNTING, RECISSION AND CONSTRUCTIVE TRUST**



$350.00
Fee
Process

**NOW INTO COURT**, through undersigned counsel, comes the Plaintiff, Vincent Pomponi, who hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Newpark Resources, Inc. ("Newpark" or the "Company") on behalf of the Company against certain of its officers and directors that seeks to remedy the defendants' violations of state and federal law, including violations of the Sarbanes-Oxley Act of 2002 ("SOX") and Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that have caused Newpark to suffer substantial losses and other damages, such as to its reputation and goodwill. On behalf of Newpark, this action seeks damages, corporate governance reforms, an accounting, rescission and the declaration of a constructive trust to remedy defendants' violations of state and federal laws.

**Improper Financial Reporting**

2.     Between 2001 and the present, defendants caused or allowed the Company to disseminate inaccurate financial statements that improperly portrayed Newpark's financial results and business prospects. These financial statements were improper because they omitted material facts concerning Newpark's improper accounting for the processing and payment of invoices, and that the Company lacked adequate internal controls and systems.

3.     On March 22, 2006, Newpark suddenly announced that defendant James D. Cole ("Cole") was relinquishing his position as Chief Executive Officer ("CEO") of the Company as well as his seat on the Board of Directors (the "Board"). But defendant Cole was not leaving the Company. Rather, he took upon the role of Chairman and CEO of Newpark Environmental Water Solutions, a wholly-owned subsidiary.

4.     On April 17, 2006, defendants announced an investigation of irregularities involving the processing and payment of invoices by Soloco Texas, LP ("Soloco"), a Newpark subsidiary. This announcement coincided with an immediate 17% decline in Newpark's value. The Company

also announced that defendant Cole was being placed on administrative leave, along with defendant Matthew W. Hardey ("Hardey"), Newpark's Vice President and Chief Financial Officer ("CFO").

5.      Between April and June 2006, numerous plaintiffs on behalf of classes of Newpark shareholders filed class actions against the Company alleging violations of the federal securities laws.

6.      On May 10, 2006, Newpark notified the New York Stock Exchange ("NYSE" or the "Exchange") that it would be unable to timely file its Form 10-Q for the quarter ended March 31, 2006.  On May 16, 2006, the NYSE replied and notified the Company that if it failed to timely file its fiscal year 2006 Form 10-K, the Company risked delisting from the Exchange.

7.      On June 20, 2006, Newpark received a notice of default from the holders of more than 25% of the Company's 8 5/8 % Senior Subordinated Notes due 2007.  These Notes were issued under an indenture with U.S. Bank N. A., as trustee, in the amount of $125 million.  Under the indenture, the Company was required to timely file its periodic reports with the SEC, and in the event of a default, the Notes and all accrued interest would become immediately due and payable. The Company had to obtain periodic waivers to prevent such a default until it can timely file its periodic financial report.  Thus, as a result of defendants' improprieties, the cost of Newpark's debt financing has increased.

8.      On June 29, 2006, the Company disclosed the preliminary findings of an internal investigation.  Specifically, Newpark investigators uncovered that the Company has improperly accounted for transactions between Soloco and an unidentified supplier.  These transactions included, but are not limited to: (i) improperly paid invoices; (ii) improperly accounted for intangible assets; and (iii) improperly accounted for license arrangements. Further, defendants caused ot allowed Newpark to admit that this improper accounting was material and announced a pending restatement of its FY:01 through FY:05 financial statements to correct for these material improprieties.

9.      On this same date, defendants caused or allowed Newpark to announce the termination of defendants Cole and Hardey.

**Stock Option Backdating**

10.     The June 29, 2006 disclosures also contained the shocking revelation of an even more heinous practice that has been ongoing at Newpark since at least 1994. During this time, defendants have caused or allowed Newpark insiders to manipulate their stock option grant dates so as to secretly maximize their profits from the stock options. Specifically, certain Newpark insiders changed their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date. The price of Newpark shares on the reported option-grant date therefore was lower than the share price on the actual day options were issued. Thus, the backdating of these stock options brought Newpark insiders an instant paper gain. By engaging in this scheme, defendants were able to conceal from investors that the Company was not recording material compensation expenses and materially overstating Newpark's net income and earnings per share. By 2006, these defendants had allowed themselves and others the ability to sell over $4.3 million worth of Newpark stock and realize millions of dollars in illicit compensation through the exercise of backdated option grants and subsequent sale of Newpark stock.

11.     The traditional rationale behind the granting of stock options is to align a company's officers, directors and employees with the interests of the company. When an option is granted at or below full market value, that option is worthless until the grantee builds value in the option by building value in the company. Thus, the company and the insider both share in the value created. The backdating of options, however, subverts this principle because the instant paper gain of a backdated stock option only benefits the insider.

12.     The granting of stock options to Newpark insiders was controlled by stock-option plans, which defendants are required under federal law to present to the Company's shareholders for approval. The plans at issue at issue include the 1988 Incentive Stock Option Plan ("1988 Plan"); the 1993 Non-Employee Directors' Stock Option Plan ("1993 Plan"); the Amended and Restated 1993 Non-Employee Directors' Stock Option Plan ("Amended 1993 Plan"); and the 1995 Incentive Stock Option Plan ("1995 Plan"). The 1995 Plan, in place during the period in which most of the suspicious option grants were made, specifically reads that, "the purchase price (the "Exercise Price") of shares of Common Stock subject to each Stock Option ("Option Shares") shall equal the

fair market value ("Fair Market Value") of such shares on the date of grant of such Stock Option." The 1988 plan also restricts option grants to fair market value. The Amended 1993 Plan at issue provides that options may be granted below fair market value but only if the Board made such a determination. On information and belief, plaintiff alleges that the 1993 Plan had terms that were similar to the Restated 1993 plan concerning the granting of stock options at fair market value.

13.     Accordingly, defendants' backdating practices, which resulted in below-fair-market-value-option grants, violated the Company's stock option plans. Further, defendants' backdating practices resulted in truncated stock-option vesting periods, which also violated the stock option plans. In turn, because these plans were violated, the backdated options must be cancelled and declared void.

14.     These plans were administered by the Board and the Compensation Committee of the Board. The plans specifically spelled out this responsibility. The 1995 Plan provides that it "shall be administered by the Compensation Committee of the Board of Directors of Newpark." Specifically, the 1995 Plan conferred the following responsibilities upon the Compensation Committee: "To approve the Employees nominated by the management of the Company to be granted Stock Options; to determine the number of Stock Options to be granted to an Employee; *to determine the time or times at which Stock Options shall be granted*; to establish the terms and conditions upon which Stock Options may be exercised ...." Similarly, the Restated 1993 Plan provides: "This Plan shall be administered by the Board or by a duly authorized committee of the Board" and the 1988 Plan provides: "The Plan shall be administered by the entire Board of Directors of Newpark (the "Board") ...." On information and belief, plaintiff alleges that the 1993 Plan had terms that were similar to the Restated 1993 plan concerning the Board's responsibilities for administration. Accordingly, the Board was directly responsible for the backdating and violations of the plans.

15.     Further, defendants have caused or allowed Newpark: (i) to file materially false and misleading financial statements that materially understated its compensation expenses and materially overstated its quarterly and annual net income and earnings per share and (ii) to make disclosures in its periodic filings and proxy statements that falsely portrayed Newpark's options as having been

granted at exercise prices equal to the fair market value of Newpark's common stock on the date of the grant. Under Generally Accepted Accounting Principles ("GAAP"), the instant paper gain gotten from backdated stock options was equivalent to paying extra compensation and was thus a cost to Newpark. These costs were also not properly recorded. In turn, since these costs were not properly recorded, Newpark's profits were overstated. Thus, the pending restatement of Newpark's past financial results will need to correct for these improprieties.

16.     In addition to breaches of fiduciary duty and accounting issues, the backdating of stock options can have severe tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants. For example, for performance-based stock options (generally granted to the five highest-paid executives), a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*. Backdating, however, automatically disqualifies those options from receiving the tax break—instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

17.     The backdating scandal is outrageous and has been commented upon by the highest offices in the land. In a recent article published by the *Wall Street Journal*, Arthur Levitt, a former chairman of the Securities and Exchange Commission ("SEC") was quoted as stating that stock-option backdating "*represents the ultimate in greed*." Further, Levitt stated, "*It is stealing, in effect. It is ripping off shareholders in an unconscionable way*." San Diego analyst Michael Cohen later made similar comments published by *Bloomberg*: "*Stockholders are hit twice. ... First you're stolen from, then the stock goes down when the theft is uncovered*." Senator Chuck Grassley, Chairman of the Senate Finance Committee, concurs. He referred to stock-option backdating as "*disgusting and repulsive*." Grassley stated: "It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, '*I'm going to get mine*.' Even worse in this situation, most of the perpetrators had already gotten 'theirs' in the form of six- and seven-figure compensation packages of which most working Americans can only dream."

18.     On May 5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

19.     On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc. executives for illegally manipulating stock option grant dates.  Criminal charges were brought simultaneously, indicating the serious view taken by governmental agencies with respect to improperly backdated options.

20.     In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed that *"[t]he full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating."* He disclosed that additional cases likely would be brought in the "coming weeks and months." Cox later stated that the SEC is currently investigating more than 100 companies, a large percentage of which are technology companies, meaning many more executives could face criminal charges related to manipulating options.

21.     Indeed, on July 31, 2006, the Federal Bureau of Investigation issued an arrest warrant for Kobi Alexander ("Alexander")—former CEO of Comverse Technology, Inc. Alexander is charged with conspiracy related to backdated stock options. Alexander was considered a fugitive by the U.S. Government and had transferred more than $57 million from the U.S. to an account in Israel to conceal funds from the government. On September 27, 2006, Alexander was arrested in the Republic of Namibia, a country on Africa's southern coast that does not have an extradition treaty with the United States.

22.     On June 29, 2006, Newpark disclosed that its investigation has uncovered that "stock options granted prior to June 2003 were dated at a date other than the date their issuance was approved, and the exercise price of such options was determined by reference to sales prices of the Company's common stock other than the fair market vale [sic] of the stock as of the date of the grant, *in contravention of the Company's stock option plan.*" Plaintiff's own investigation of Newpark's past option grants has revealed several option grants that were blatantly dated at the lowest share price for the period in which they were granted dating as far back as 1994. Accordingly, this action

is necessary to end these option-backdating practices and to restore assets to the Company that have been squandered via the payment of undisclosed and undeserved compensation to corporate insiders.

23.     As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from difficulties in raising capital via the issuance of debt securities;

(c)     Costs incurred from potential fines in connection with governmental investigations;

(d)     Costs incurred from increased Directors and Officer's Insurance ("D&O Insurance") premiums as a result of the illegally manipulated stock option grants;

(e)     Costs incurred from Newpark's potential delisting from the NYSE, including additional costs incurred to find investors;

(f)     Costs incurred from penalties or interest related to potentially unpaid taxes, and costs incurred from potential investigations or audits by the Internal Revenue Service ("IRS") and/or state revenue officials;

(g)     Costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(h)     Costs incurred from directing manpower to correct Newpark's defective internal controls; and

(i)     Costs incurred from directing manpower to restate Newpark's prior financial results to correct for the improper accounting and improperly dated stock option grants.

24.     A recent study from the University of Michigan's Ross School of Business indicates that the fallout for Companies implicated in stock-option backdating can result in a company's market value dropping an average of 8%. Accordingly, Newpark will likely suffer a similar decline in market value of approximately $37 million related to this backdating scandal.

25. On September 22, 2006, Newpark disclosed that it redeemed the entire $125 million outstanding on its 8 5/8% Senior Subordinated Notes plus accrued interest. In connection with the redemption, Newpark was forced to draw down the entire amount of its new $150 million Term Loan Facility.

## JURISDICTION AND VENUE

26. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part out of the laws of the United States, including SOX and the Exchange Act.

27. Additionally, this Court has diversity jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000, exclusive of interest, costs and fees. This action is not collusive nor designed to artificially confer jurisdiction on this United States District Court where it would not otherwise exist. In addition, this Court also supplemental jurisdiction in this matter pursuant to 28 U.S.C. §1367(a).

28. Unquestionably, this Court has personal jurisdiction over the defendants named herein. Newpark's headquarters are located in Metairie, Louisiana, and this Court retains general jurisdiction over each named defendant who is a resident of Louisiana. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with Louisiana to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Newpark is a citizen of Louisiana and, because the allegations contained herein are brought derivatively, on behalf of Newpark, defendants' conduct was purposefully directed at Louisiana. Defendants' conduct arose within this federal judicial district where Newpark maintains its corporate headquarters. As such, exercising jurisdiction over any non-resident defendants is reasonable under these circumstances.

29. Venue is proper in this Court, pursuant to 28 U.S.C. §1391(a), because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this Complaint, including the defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and

conspiracy in violation of fiduciary duties owed to Newpark, occurred in substantial part in this District. Finally, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had and have an effect in this District.

## THE PARTIES

30.     Plaintiff Vincent Pomponi is, and was at times relevant hereto, an owner and holder of Newpark common stock. Plaintiff is a citizen of the State of Washington.

31.     Nominal defendant Newpark is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 3850 North Causeway Boulevard, Metairie, Louisiana. Newpark, together with its subsidiaries, provides fluids management, environmental, and oilfield services to the oil and gas exploration and production industry. The Company likewise provides drilling fluids sales and engineering services, as well as onsite drilling fluids processing services. Newpark is a citizen of both Louisiana and Delaware.

32.     Defendant Cole was Newpark's CEO from May 1977 until his retirement in March of 2006. Cole was Newpark's Chairman of the Board from April 1996 to March 2005. Cole was Newpark's President from May 1977 to September 2000. Cole joined Newpark as Executive Vice President and served in that capacity from 1976 to May 1977. Because of Cole's positions, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Cole participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Cole received at least 105,000 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Cole backdated these stock options and received illegal compensation from Newpark that was not

disclosed to the Company's shareholders.  Newpark paid defendant Cole the following compensation during the past years:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Cole | 2004 | $320,000 | $0 | 40,000 | $7,864 |
| | 2003 | $320,000 | $0 | 40,000 | $11,045 |
| | 2002 | $280,000 | $0 | 100,000 | $9,848 |
| | 2001 | $280,000 | $280,000 | - | $7,938 |
| | 2000 | $280,000 | $0 | - | $10,050 |
| | 1999 | $280,000 | $0 | - | $5,900 |
| | 1998 | $280,000 | $0 | - | $11,109 |
| | 1997 | $220,000 | $220,000 | - | $9,799 |
| | 1996 | $200,000 | $220,000 | - | $8,700 |
| | 1995 | $180,000 | $180,000 | 210,000 | $5,592 |
| | 1994 | $180,000 | $180,000 | - | $2,208 |

Defendant Cole sold 140,000 shares of Newpark stock for proceeds of $2,966,500 while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices and the improper accounting.  Cole is a citizen of Louisiana.

33.    Defendant Hardey was Newpark's Vice President and CFO from April 1991 until his termination in 2006.  Hardey was Newpark's Treasurer and Assistant Secretary from May 1988 until April 1991.  Because of Hardey's positions, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  At times relevant hereto, Hardey participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Hardey received at least 118,900 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Hardey backdated these stock options and received illegal compensation from Newpark

that was not disclosed to the Company's shareholders.  Newpark paid defendant Hardey the following compensation during the past years:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Hardey | 2004 | $200,000 | $0 | 20,000 | $3,643 |
| | 2003 | $200,000 | $0 | 20,000 | $7,206 |
| | 2002 | $170,000 | $0 | 75,000 | $4,947 |
| | 2001 | $170,000 | $85,000 | - | $5,894 |
| | 2000 | $170,000 | $0 | 20,000 | $6,323 |
| | 1999 | $170,000 | $0 | 25,000 | $5,398 |
| | 1998 | $160,000 | $0 | 20,000 | $7,138 |
| | 1997 | $145,000 | $60,000 | - | $6,090 |
| | 1996 | $112,000 | $55,000 | 60,000 | $4,014 |
| | 1995 | $106,200 | $31,500 | 37,800 | $3,545 |
| | 1994 | $95,000 | $23,750 | 10,500 | $856 |

*Defendant Hardey sold 25,000 shares of Newpark stock for proceeds of $202,170 while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices and the improper accounting.  Hardey is a citizen of Louisiana.*

34.     Defendant David P. Hunt ("Hunt") is Newpark's non-executive Chairman and has been since March 2005.  Hunt is also a Newpark director and has been since 1995.  Because of Hunt's positions, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  At times relevant hereto, Hunt participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Hunt received at least 22,000 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases.  Accordingly, on information and belief, plaintiff alleges that Hunt backdated these stock options and received illegal compensation from Newpark that was not disclosed to the Company's shareholders.  Defendant Hunt sold 68,000 shares of Newpark stock for proceeds of

$435,313 while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices and the improper accounting. Hunt is a citizen of Ohio.

35.     Defendant Alan J. Kaufman ("Kaufman") is a Newpark director and has been since 1987. Because of Kaufman's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Kaufman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Kaufman received at least 2,500 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Kaufman backdated these stock options and received illegal compensation from Newpark that was not disclosed to the Company's shareholders. Defendant Kaufman sold 10,000 shares of Newpark stock for proceeds of $64,500. Kaufman is a citizen of Florida.

36.     Defendant James H. Stone ("Stone") is a Newpark director and has been since 1987. Because of Stone's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its  finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Stone participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Stone is a citizen of Louisiana.

37.     Defendant Roger C. Stull ("Stull") is a Newpark director and has been since 2000. Because of Stull's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Stull participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Stull is a citizen of California.

38.     Defendant Jerry W. Box ("Box") is a Newpark director and has been since 2003. Because of Box's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Box participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Box is a citizen of Texas.

39.     Defendant F. Walker Tucei, Jr. ("Tucei") is a Newpark director and has been since 2003. Because of Tucei's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Tucei participated in

the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Tucei is a citizen of Louisiana.

40.     Defendant Gary L. Warren ("Warren") is a Newpark director and has been since 2003. Because of Warren's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Warren participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Warren is a citizen of Texas.

41.     Defendant W. Thomas Ballantine ("Ballantine") was Newpark's President and Chief Operating Officer from September 2000 to July 2006. Ballantine was a Newpark director from 1993 until July 2006. Ballantine was Newpark's Executive Vice President from 1992 to September 2000. From December 1988 to 1992, Ballantine was Newpark's Vice President of Operations. Because of Ballantine's positions, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Ballantine participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Ballantine received at least 131,000 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Ballantine backdated these stock options and received illegal

compensation from Newpark that was not disclosed to the Company's shareholders. Newpark paid defendant Ballantine the following compensation during the past years:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Ballantine | 2004 | $260,000 | $0 | 20,000 | $6,138 |
| | 2003 | $260,000 | $0 | 20,000 | $10,350 |
| | 2002 | $220,000 | $0 | 85,000 | $7,652 |
| | 2001 | $220,000 | $110,000 | - | $6,618 |
| | 2000 | $220,000 | $0 | 20,000 | $10,050 |
| | 1999 | $220,000 | $0 | 25,000 | $5,541 |
| | 1998 | $220,000 | $0 | 20,000 | $7,356 |
| | 1997 | $200,000 | $100,000 | - | $7,918 |
| | 1996 | $185,000 | $100,000 | 80,000 | $6,645 |
| | 1995 | $176,200 | $52,500 | 84,000 | $5,687 |
| | 1994 | $165,000 | $41,250 | 10,500 | $1,860 |

Defendant Ballantine sold 34,666 shares of Newpark stock for proceeds of $694,638 while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices and the improper accounting. Ballantine is a citizen of Pennsylvania.

42.    Defendant R. Michael Still ("Still") was a Newpark director from 1979 to January 1996. Because of Still's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Still participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Still is a citizen of Oklahoma.

43.    Defendant Dibo Attar ("Attar") was a Newpark director from 1987 to 2000. Because of Attar's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, he improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to

- 15 -

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Attar participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Attar is a citizen of Florida.

44.     Defendant Philip S. Sassower ("Sassower") was Newpark's Chairman from December 1987 to April 1996. Because of Sassower's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Sassower participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Sassower is a citizen of New York.

45.     Defendant Lawrence I. Schneider ("Schneider") was a Newpark director from 1987 to 1995. Because of Schneider's position, he knew or should have known that Newpark insiders were improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Schneider participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Schneider is a citizen of New York.

46.     Defendant David C. Baldwin ("Baldwin") was a Newpark director from June 2000 to 2002. Because of Baldwin's position, he knew or should have known that Newpark insiders were

improperly backdating stock option grants to maximize their personal profits as well as the adverse non-public information about the business of Newpark, specifically, the improper processing and payment of invoices, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. At times relevant hereto, Baldwin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Baldwin is a citizen of Florida.

47. The defendants identified in ¶¶32, 34-46 are referred to herein as the "Director Defendants." The defendants identified in ¶¶32-33, 41 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶32-35, 41 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

48. By reason of their positions as officers, directors and/or fiduciaries of Newpark and because of their ability to control the business and corporate affairs of Newpark, the Individual Defendants owed Newpark and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Newpark in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Newpark and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

49. Each director and officer of the Company owes to Newpark and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Newpark, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Newpark, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Newpark as well as defendants' backdating practices.

51.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Newpark, and was at all times acting within the course and scope of such agency.

52.     To discharge their duties, the officers and directors of Newpark were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Newpark were required to, among other things:

        (a)     refrain from acting upon material inside corporate information to benefit themselves;

        (b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

        (c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Newpark conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)     ensure that Newpark's internal controls are sufficient to prevent backdating or other manipulations of stock options granted to Newpark insiders; and

(g)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Newpark, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company at times relevant hereto has been ratified by the remaining Individual Defendants who collectively comprised all of Newpark's Board at times relevant hereto.

54.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct at times relevant hereto, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Newpark has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from difficulties in raising capital via the issuance of debt securities;

(c)     Costs incurred from potential fines in connection with governmental investigations;

(d)     Costs incurred from increased D&O Insurance premiums as a result of the *illegally manipulated stock option grants;*

(e)     Costs incurred from Newpark's potential delisting from the NYSE, including additional costs incurred to find investors;

(f)     Costs incurred from penalties or interest related to potentially unpaid taxes, and costs incurred from potential investigations or audits by the IRS and/or state revenue officials;

(g)     Costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(h)     Costs incurred from directing manpower to correct Newpark's *defective* internal controls; and

(i)     Costs incurred from directing manpower to restate Newpark's prior financial results to correct for the improper accounting and improperly dated stock option grants.

55.     Also, a recent study from the University of Michigan's Ross School of Business indicates that the fallout for Companies implicated in stock-option backdating can result in a company's market value dropping an average of 8%. Accordingly, Newpark will likely suffer a similar decline in market value of approximately $37 million related to backdating.

56.     On September 22, 2006, Newpark disclosed that it redeemed the entire $125 million outstanding on its 8 5/8% Senior Subordinated Notes plus accrued interest. In connection with the redemption, Newpark was forced to draw down the entire amount of its new $150 million Term Loan Facility.

57.     Moreover, these actions have irreparably damaged Newpark's corporate image and goodwill. For at least the foreseeable future, Newpark will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior

- 20 -

and have misled the investing public, such that Newpark's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

59.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Company insiders were improperly backdating their stock option grants; (ii) conceal the fact that as a result of the improperly backdated stock option grants, the Company's financial statements were inaccurate; (iii) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (iv) maintain the Individual Defendants' executive and directorial positions at Newpark and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (vi) deceive the investing public, including shareholders of Newpark, regarding the Individual Defendants' management of Newpark's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants at times relevant hereto.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

60.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing at times relevant hereto.  During this time the Individual Defendants caused the Company to conceal the true fact that Newpark was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Newpark's financial performance and future business prospects, as alleged herein.

61.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things; (a) to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; (b) to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and (c) to artificially inflate the price of Newpark common stock so they could dispose of over $4.3 million of their personally held stock and protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

62.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

64.     Newpark, together with its subsidiaries, provides unique, high performance and environmentally safe drilling fluids systems, as well as other products and chemicals used in drilling for oil and gas, and removes and disposes of waste created in the oil and gas drilling and production processes. Newpark also provides temporary work sites and related access roads necessary to support the heavy loads involved in oil and gas drilling operations, and site closure and remediation upon completion of those operations.

## IMPROPER STATEMENTS

65.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Newpark a duty to insure that the Company's financial reporting fairly presented, in all

material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements. This material, non-public information included the improper processing and payment of invoices.

66.     Furthermore, defendants Tucei, Hunt, Kaufman and Stull, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for reviewing and discussing with management the Company's quarterly financial statements, as well as financial information and earnings guidance provided to analysts and rating agencies.

67.     Defendants Cole, Ballantine and Hardey, as officers of Newpark, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Cole, Hunt, Kaufman, Stone, Tucei, Still, Attar, Sassower, Schneider, Baldwin, Ballantine, Stull, Box and Warren as directors of Newpark had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred at times relevant hereto as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Newpark to the investing public and the Company's shareholders at times relevant hereto.

68.     On April 30, 2001, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports First Quarter Net Up 1380% on 74% Revenue Gain." The press release stated in relevant part:

> Newpark Resources, Inc. today announced earnings for the first quarter ended March 31, 2001 of $7.0 million, equal to $.10 per basic and diluted share, on revenues of $99.4 million. This compares to net income of $474,000, or $.01 per share, on revenues of $57.3 million in the first quarter of last year. Net income increased 1,380% on a 74% revenue gain.
>
> Earnings before interest, taxes, depreciation and amortization totaled $23.1 million, or 23% of revenue for the quarter, compared to $11.5 million, or 20% of revenue, reported in the first quarter of 2000.

James D. Cole, Chairman and CEO, attributed the first quarter improvement to several factors, including: the sale during the period of 5,700 of the Company's new composite mats compared to total sales of 1,500 in all of last year; increased drilling activity along the U.S. onshore Gulf Coast which favorably impacted pricing and volume of the Company's rental mat systems; and the 72% increase in drilling fluid sales and the continuing improvement in operating margin in that segment of the Company's business.

69.    On July 30, 2001, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Earnings Increase 550% on 80% Revenue Growth." The press release stated in relevant part:

Newpark Resources, Inc. today reported that it earned net income of $9.2 million, equal to $.13 per share, on total revenue of $108.3 million in the quarter ended June 30, 2001. This compares to net income of $1.3 million, equal to $.02 per share, (before the effect of a non-cash charge of $3.5 million or $.05 per share) on revenue of $60.2 million in the corresponding quarter of 2000.

For the six months ended June 30, Newpark reported net income of $16.2 million, or $.23 per share, on revenue of $207.7 million, compared to net income of $1.8 million or $.03 per share, (before the effect of a non-cash charge of $3.5 million or $.05 per share) on $117.5 million of revenue in the first half of fiscal 2000.

Newpark's net income amounted to 9.4% of revenue in the recent quarter, compared to 2.9% in the second quarter of 2000. James D. Cole, Newpark's Chairman and CEO, attributed the earnings gain to improved operating results in the company's Mat and Integrated Services and Drilling Fluids businesses.

70.    On October 25, 2001, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Earns $.12 Per Share on 37% Revenue Increase in 3rd Quarter." The press release stated in relevant part:

Newpark Resources, Inc. today reported that it earned $8.6 million, equal to $.12 per diluted share, on revenue of $108.9 million in the quarter ended September 30, 2001. This compares to third quarter earnings of $3.3 million, equal to $.05 per diluted share, on revenue of $69.0 million in the same period of 2000. EBITDA for the quarter ended September 30, 2001 increased 51% to $25.6 million compared to $17.0 million in the third quarter of last year.

For the nine months ended September 30, 2001, Newpark earned $24.8 million, or $.34 per diluted share on revenue of $316.6 million, compared to $1.6 million, or $.02 per diluted share, on revenue of $186.4 million in the comparable 2000 period. EBITDA for the nine months ended September 30, 2001 was $75.9 million. This compares to EBITDA of $41.9 million for the nine-month period of the prior fiscal year. Working capital in the nine months rose to $132 million, while long term debt was reduced by 10% to $183 million over the same period.

71.    On February 26, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports Improved 2001; Keeps Focus on Rebound in Natural Gas Cycle." The press release stated in relevant part:

Newpark Resources, Inc. today reported 2001 net income of $28 million, or $.37 per diluted share, on revenues of $409 million. This represents a 360% increase in earnings per share, on revenue growth of 53%. Comparable earnings for 2000 were $5.6 million, equal to $.08 per diluted share, on revenues of $267 million.

For the fourth quarter, Newpark reported net income of $3.2 million, or $.05 per diluted share, on revenue of $92 million. This compares to net income of $4 million, or $.06 per share, on revenues of $80.1 million in the same quarter a year ago.

72.     On April 29, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports First Quarter Earnings of 1 Cent Per Share; Uses Cash Flow to Continue Debt Reduction During Drilling Downturn." The press release stated in relevant part:

Newpark Resources, Inc. today reported that it earned $521,000, equal to $.01 per diluted share, on revenue of $75.1 million for the first quarter ended March 31, 2002. This compares to net income of $7.0 million, or $.10 per share, on revenue of $99.4 million in the same quarter of last year. The 25% revenue decline mirrors the reduction in business activity in Newpark's key markets, as measured by the rig count, which fell 28% over the last 12 months. Earnings before interest, taxes, depreciation and amortization totaled $11.5 million, or 15.4% of revenue.

During the quarter, Newpark reduced its outstanding borrowings by $15 million and reduced its leverage ratio to 35.3% from 37.6% at year-end and 40.5% a year ago. This was accomplished from operating cash flow and an $8.4 million reduction in net working capital compared to 2001 year-end levels. Depreciation in the quarter totaled $6.1 million and capital expenditures were $3.2 million.

73.     On July 31, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports Second Quarter Profit; Sees Positive Outlook for Second Half." The press release stated in relevant part:

Newpark Resources, Inc. today announced that it earned income of $269,000 on revenues of $77.6 million for the second quarter of 2002. This compares to net income of $9.2 million, equal to $.13 per share, on $108.3 million in revenue in the second quarter of 2001. During the quarter, Newpark completed the public offering of two million common shares, proceeds of which were used to repurchase all of the outstanding Series A preferred stock for $15 million plus accrued dividends. That transaction reduced income available to common shareholders by a $1 million non-recurring, non-cash after tax dividend not included in the above results, representing primarily the write-off of the remaining discount associated with the Series A preferred stock.

For the first six months of 2002, Newpark earned income of $790,000, equal to $.01 per share, on revenues of $152.7 million. This compares to net income of $16.2 million, equal to $.23 per share, on $207.7 million in revenue in the same period of 2001. Results for the first half of 2002 also exclude the effect of the non-recurring item discussed above.

James D. Cole, Newpark Chairman and CEO commented that "positive developments in the quarter included revenue and income growth in the U.S. drilling

fluids market, completion of the Ava, S.p.A. Rome, Italy-based acquisition that
*establishes a drilling fluids presence in key foreign markets, and improved operating*
results in the E&P waste unit."

74.    On October 29, 2002, *the Individual Defendants caused or allowed the Company to*

issue a press release entitled "Newpark Resources Reports Third Quarter Results, Sees Improvement

in Fourth Quarter and 2003." The press release stated in relevant part:

> *Newpark Resources, Inc. today announced that it earned income of $31,000, or*
> *break-even on a per diluted share basis, on revenues of $79.4 million for the three*
> *months ended September 30, 2002. This compares to third quarter 2001 net income*
> *of $8.6 million, or $0.12 per diluted share, on $108.9 million in revenue. Operations*
> *were negatively impacted by hurricane activity in the Gulf of Mexico. The company*
> *estimates revenues of $7 million, carrying an earnings impact of $0.03 per diluted*
> *share, were lost as Hurricanes Lili and Isidore disrupted Gulf of Mexico drilling and*
> *operating activity. Further impacting the quarter's total revenue figures was a 28%*
> *quarter-to-quarter decline in rig activity.*
>
> For the first nine months of 2002, Newpark earned income of $1.3 million
> before unusual items, or $0.02 per diluted share, on revenues of $232.1 million. This
> *compares to net income of $24.8 million, or $0.34 per diluted share, on $316.6*
> million in revenue in the same period of 2001. The unusual item included the effect
> of $1 million in non-recurring, non-cash after tax dividends primarily representing
> *the accelerated amortization of the remaining discount associated with the Series A*
> Preferred Stock that was redeemed in the second quarter. In addition, the current year
> to date benefited from the cessation of the amortization of goodwill, which totaled
> $3.7 million in the 2001 period.
>
> James D. Cole, Newpark Resources Chairman and CEO, said: "The
> *significant operations progress Newpark has made through this market bottom is*
> masked, in part, by adverse weather that impacted September operations, which
> precipitated our revised guidance on October 7. Because of this inflection point with
> *our industry and its impact on Newpark's business segments, we have expanded the*
> content of this discussion to put in plain words how Newpark is rapidly improving."

75.    On February 27, 2003, *the Individual Defendants caused or allowed the Company to*

issue a press release entitled "Newpark Resources Reports Fourth Quarter and Full Year 2002

Results; Sees Improving Market Conditions in All Business Segments." The press release stated in

relevant part:

> *Newpark Resources, Inc. today announced that it earned net income of $513,000, or*
> *$0.01 per diluted share, on revenue of $321.2 million for the fiscal year ended*
> December 31, 2002. This compares to net income of $28.0 million, or $0.37 per
> diluted share, on revenue of $408.6 million in 2001. Net income for 2002 includes
> the effect of a non-recurring, non-cash after tax dividend of $1.0 million recorded in
> the second quarter, representing primarily the write-off of the remaining discount
> associated with the Series A preferred stock which was redeemed at that time.
>
> For the fourth quarter ended December 31, 2002, Newpark earned net income
> of $747,000, or $0.01 per diluted share, on revenues of $89.1 million. This compares
> to net income of $3.2 million, or $0.05 per share, on revenues of $92.0 million in the
> fourth quarter of 2001. Revenues in the fourth quarter rose 12% compared to the

preceding quarter, with much improvement realized in the mat segment. James D. Cole, Newpark Resources Chairman and CEO said, "As we enter 2003, the first quarter is typically the seasonal low in the U.S. market. The typical seasonality is exacerbated this year by the prevailing uncertainty created by current economic and political concerns. In addition, we see the industry adjusting to the challenge of deeper and more complex drilling, which carries increased risk and higher costs. We believe the early signs of the industry's response to the challenge are just beginning to be seen, and will become increasingly evident with each successive quarter of 2003."

76.     On May 5, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports First Quarter Earnings; Sees Market Improvement Ahead." The press release stated in relevant part:

Newpark Resources, Inc. today announced that it earned net income of $1,224,000, or $0.02 per diluted share, on revenue of $90.6 million for the quarter ended March 31, 2003. This compares to net income of $521,000, or $0.01 per diluted share, on revenue of $75.1 million in the first quarter of 2002.

James D. Cole, Newpark's Chairman and CEO commented, "We believe that this first quarter marks the beginning of the turnaround for our Gulf Coast businesses. The Gulf Coast market in the first quarter accounted for 62% of the Company's revenue where, historically, it would have constituted 70% of the total, indicative of the low level of activity in that market during the first quarter. We first saw improvement in the mat rental business beginning late in the fourth quarter of 2002 and that trend has continued. Many of our customers in the offshore Gulf of Mexico market have indicated that they will soon be starting back to work and we believe that further improvement will be seen across the remaining quarters of 2003."

He continued, "We believe that a review of the sequential changes in our operations since the fourth quarter of 2002 is more relevant than year-over-year comparisons as the business model of each of the operating units has changed substantially, and we have focused our comments on the current market and its effects on our operating results."

77.     On July 28, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports Second Quarter Earnings." The press release stated in relevant part:

Newpark Resources, Inc. today reported that it earned net income of $1,774,000, or $.02 per share, on revenue of $92.4 million in the second quarter ended June 30, 2003. This compares to a net loss of $786,000, equal to $.01 per share, on $77.6 million in revenue in the second quarter of the prior year.

For the six months to date, Newpark reported net income of $2,998,000, or $0.04 per share, on revenue of $183.0 million, compared to a net loss of $265,000 on revenue of $152.7 million in the same period of 2002.

"While the U.S. rig count has increased by 30% since the beginning of the year, Newpark's key Gulf Coast market has not participated in this trend and remains below the level at which we ended fiscal 2002. In spite of the flat market, Newpark's operations showed a small improvement from the first quarter levels," said James D. Cole, Newpark's Chairman and CEO. "We believe that the flat Gulf Coast rig count

- 27 -

is a function of the changing risk profile of operations in that market, driven by the challenge of increasing geologic well depth, drilling prospect identification and the resultant higher cost of drilling. From review of our customers' plans going forward, we believe that they are adapting to this change and expect increased activity beginning in the second half of 2003," he added.

78.    On November 6, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Newpark Resources Reports Financial Results for the Third Quarter

and Nine Months Ended September 30, 2003." The press release stated in relevant part:

> Newpark Resources, Inc. today reported third quarter 2003 net income of $446,000 or $0.01 per share, on revenue of $95.6 million. This compares to net income of $31,000 on $79.4 million in revenue in the same quarter of the prior year. During the third quarter, the Company paid down $4.5 million on its bank credit facility, reducing its long-term debt to capital ratio to 35.0% at quarter-end.

> For the nine months ended September 30, 2003, Newpark reported net income of $3,443,000, or $0.04 per share, on revenue of $278.6 million, compared to a net loss of $234,000 on revenue of $232.1 million in the same period of 2002.

> Commenting on financial and operating results, James D. Cole, Newpark's Chairman and CEO said: "The last two years have been a time of transition for the exploration and production companies of every size operating in the Gulf Coast market. Our customers are dealing with a higher risk profile as the challenges of deeper geology and deeper water have substantially changed the economics of operating in this complex market. Newpark has had to adapt as well. As recently as 1997, practically none of our revenue was derived from markets outside of the Gulf Coast region. To date in 2003, non-Gulf Coast revenue accounts for 40% of the total, and we expect that it will increase to 50% over the next two to three years. We have recently opened a new waste disposal facility in Wyoming's Jonah-Pinedale trend, a very active Rocky Mountain gas play. The Canadian market continues to be a source of growth in both the drilling fluids and waste management businesses."

> He continued: "We are confident that drilling expenditures and service company revenues will rebound in the Gulf Coast market as operators adapt and develop new understandings of their seismic data and adopt new techniques and technologies to economically drill their prospects. However, we are convinced that the activity will trend toward fewer, but much deeper wells aiming for bigger targets. The good news is that Newpark's key products are well suited to assist our customers as they make this transition and are gaining acceptance from customers as we diversify geographically into markets far distant from our historic base."

79.    On February 25, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Newpark Resources Reports Fiscal 2003 and Fourth Quarter Results."

The press release stated in relevant part:

> Newpark Resources, Inc. today announced that it earned net income of $493,000, or $0.01 per diluted share on revenue of $373.1 million for the fiscal year ended December 31, 2003. This compares to net income of $513,000, or $0.01 per diluted share, on revenue of $321.2 million for the fiscal year ended December 31, 2002.

> For the fourth quarter ended December 31, 2003, Newpark reported a net loss of $3.0 million, equal to $0.04 per share, on revenue of $94.6 million. This compares

- 28 -

to net income of $747,000, or $0.01 per diluted share, on revenues of $89.1 million for the year-ago quarter.

James D. Cole, Newpark's chairman and CEO said: "In 1997 we began a strategy to broaden Newpark's revenue base beyond the Gulf Coast base and offer some products to customers other than our traditional oilfield customers.  During 2003, those new markets provided 45% of the revenue and accounted for 75% of Newpark's segment operating income.  While the US rig count rose by 30% during the year, the Gulf Coast market did not participate in that recovery, ending the year down slightly from 2002 levels.  Newpark would benefit significantly in 2004 from any rebound in activity in the Gulf Coast market."

80.    On April 26, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Newpark Resources Reports First Quarter Results." The press release

stated in relevant part:

Newpark Resources, Inc. today announced that it earned net income of $1,415,000, or $0.02 per diluted share, on revenue of $104.3 million for the quarter ended March 31, 2004.  This compares to net income of $1,224,000, or $0.02 per diluted share, on revenue of $90.6 million for the quarter ended March 31, 2003.

Newpark's revenue and earnings in markets outside of its historic Gulf Coast base continued to increase and were primarily responsible for the first quarter's positive result.  Non-Gulf Coast and non-oilfield revenues totaled $56.3 million in the quarter, contributing $8.6 million to segment operating profit.  Gulf Coast oilfield revenue amounted to $48.1 million and generated a $700,000 segment operating loss.

James D. Cole, Newpark's chairman and CEO commented: "We are encouraged by the performance of the Company in the non-Gulf Coast markets that we have been developing for the past five years.  In the first quarter, these new markets provided 54% of Newpark's total revenue versus 43% a year ago.  We believe that improvement in the second quarter will come from continued strength in these markets and from several segments within our historic Gulf Coast market.  We expect that near-term gains in the Gulf Coast market will be driven not by rig activity, but from improving revenue per rig due to the increasing depth and complexity of drilling."

81.    On July 26, 2004, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Newpark Resources Reports Second Quarter, Six Months Results." The

press release stated in relevant part:

Newpark Resources, Inc. today announced that it earned net income of $1,342,000, equal to $0.02 per diluted share, on revenue of $104.6 million for the quarter ended June 30, 2004.  This compares to net income of $1,774,000, or $0.02 per diluted share, on revenue of $92.4 million for the second quarter of 2003. Compared to the first quarter of 2004, operating results in the period were reduced by $0.02 per share from the unusually lengthy seasonal road bans in Western Canada, which restricted operations in that market throughout the quarter.

For the six months ended June 30, 2004, Newpark earned net income of $2,757,000, or $.03 per share, on revenue of $208.9 million.  This compares to net income of $2,998,000, equal to $.04 per share, and revenue of $182.9 million for the six months ended June 30, 2003.  In addition to the reductions affecting the second

- 29 -

quarter described above, the company has expended litigation costs equal to $0.02 per share during the first six months of 2004 in order to protect certain trade secrets within its drilling fluids business. The litigation was settled in July.

> *James D. Cole, Newpark's chairman and CEO commented:* "Despite the issues encountered in the quarter, Newpark made substantial progress in implementing its long-term strategy in the period. We continued to improve penetration of the Gulf Coast drilling fluids business, increased non-oilfield mat rental revenue, improved pricing in the oilfield mat rental business, and made significant improvement in composite mat sales. Based on these trends, which are discussed below and are continuing, we expect improved results for the third quarter."

82.     On October 25, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Newpark Resources Reports Weather Impacted Third Quarter and

Nine Months Earnings." The press release stated in relevant part:

> Newpark Resources, Inc. today announced that it earned net income of $735,000, equal to $0.01 per diluted share, on revenue of $110.8 million for the quarter ended September 30, 2004. *This compares to net income of $446,000, or $0.01 per diluted share*, on revenue of $95.6 million for the third quarter of 2003.

> For the nine months ended September 30, 2004, Newpark earned net income of $3,492,000, or $.04 per share, on revenue of $319.7 million. This compares to net income of $3,444,000, equal to $.04 per share, and revenue of $278.6 million for the nine months ended September 30, 2003.

> James D. Cole, Newpark's Chairman and CEO, stated: "Newpark's third-quarter earnings were negatively impacted by approximately $0.05 per share as a result of unusual weather conditions affecting two key market areas during the period. In the Gulf of Mexico market, Hurricanes Frances and Ivan and other tropical systems interrupted operations throughout the market and delayed new project starts during the period. This directly impacted our environmental business, which experienced a sequential decline in drilling-related revenue due to weather-related disruption of operations with a net income effect of $0.01 per share. The impact in the matting segment was approximately $0.02 per share, including both *oilfield drilling projects and non-oilfield mat rental operations. Newpark's non-oilfield rentals are a relatively new line of business*, focused primarily on providing site access for electrical transmission line upgrades and maintenance. Much of that industry's capacity was diverted to Florida and adjacent storm-affected areas of the southeast for emergency repair operations throughout the recent quarter."

> "Drilling Fluids operations in the Gulf of Mexico market were burdened with a significant number of non-revenue days as storms shut in operations for a portion of the period. In addition, the unusually wet weather that persisted in western Canada throughout the quarter delayed rig moves and the start of new projects. While total revenue and earnings in the segment were up sharply on a sequential basis, identified project delays affected the period by the net income equivalent of $0.02 per share. Gulf of Mexico operations have subsequently rebounded to a level consistent with the improvement forecast by the Company for the third quarter and should be demonstrated in Newpark's fourth quarter results," he concluded.

83.    On February 28, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports 2004 Results; Fourth Quarter Operating Income Rebounds on 20% Revenue Growth," in which the Company reported its financial and operational results for the 4Q:04 and the year ending December 31, 2004. The press release stated in relevant part:

> Newpark Resources, Inc. today reported net income for the year ended December 31, 2004 of $4.0 million, or $0.05 per common share including non-cash charges of $0.03 per common share, on revenue of $433.4 million.  This compares to net income of $494,000 or $0.01 per common share, on revenue of $373.2 million in 2003. For the fourth quarter, Newpark reported net income of $526,000 or $0.01 per share, after the same $0.03 per share in non-cash items, on revenue of $113.7 million versus a net loss in 2003 of $2.9 million or $0.04 per share on revenue of $94.6 million.  Segment operating income increased 35% for the year and 151% for the quarter, primarily driven by improvements in Newpark's Drilling Fluids and Mat Sales and Rental Business Units.

* * *

> James D. Cole, Newpark's chairman and CEO said: "We believe the improved fourth quarter operating results mark the beginning of a trend that should be more evident in 2005.  With approximately 50% of revenue generated from new markets, products and services, the pattern of revenue generation in 2004 evidences the progress of Newpark's diversification away from its historic Gulf Coast market. While working to implement this strategy, our efforts were complicated by a 35% decline in activity in that market. The company's earnings performance has suffered during the implementation of this initiative, during which time we have reshaped our ongoing Gulf Coast business to restore profitability at current activity levels.  The introduction of new products and services has helped achieve the objective of diversifying the revenue and earnings base.  We are growing our market share in our drilling fluids business and expanding into new markets in the mat sales and rental business.  In addition, we have recently announced the introduction of a new, proprietary water treatment technology and its application to E&P waste streams in the Green River and Powder River basins.  In short, we believe there are good opportunities for continued growth ahead for Newpark Resources."

* * *

> Newpark recently announced the formation of Newpark Environmental Water Solutions, LLC and the first application of a newly licensed proprietary water treatment technology to improve the throughput capacity of the Company's Jonah-Pinedale oilfield waste disposal site in Wyoming, a very active North American natural gas trend. In addition, the Company has received a contract award for a treatment facility near Gillette, Wyoming for a major independent operator in the coalbed methane market. "We believe that the application of this proprietary technology to the waste water problems within the oil and gas industry could be a major new business for Newpark," said Cole.

84.    On April 27, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Newpark Resources Reports Six Cents Per Share in First Quarter on

24% Revenue Gain," in which the Company reported its financial and operational results for the

1Q:05 ending March 31, 2005. The press release stated in relevant part:

> Newpark Resources, Inc. today announced earnings of $4.9 million, or $.06 per diluted share, on revenue of $129.1 million for the quarter ended March 31, 2005. This compares to $1.4 million of net income, or $.02 per diluted share, on revenue of $104.3 million in the first quarter of 2004.
>
> The earnings improvement was led by the mat rental and sales business unit, the result of improved rental pricing in the Gulf Coast mat rental market, increased non-oilfield rental revenue, and increased sales of Newpark's DuraBase(TM) composite mats.
>
> James D. Cole, Newpark's CEO said: "In addition to improvements in operations during the quarter, two other events merit comment. First, we reached agreement to acquire the third-party interest in our DuraBase(TM) mat manufacturing facility and completed that transaction early in April. We now are in a position to implement several improvements to that product family. In addition, we announced the first applications of our new water treatment technology in the E&P market. We believe this proprietary technology will solve water quality problems in many markets, including coal bed methane gas production and the heavy oil operations of Canada, and could mature into a new stand-alone product line for the Company."
>
> * * *
>
> E&P Waste Disposal
>
> Waste processing revenue of $15.4 million declined $1.8 million from the year ago quarter due to the early seasonal break-up in the Canadian market. Operating earnings were $1.3 million or 9% compared to $2.8 million and 16% in the 2004 period. The earnings decline resulted from the combined effect of the revenue decline in Canada and the start-up costs associated with the new water treatment operations in Wyoming. In the Gulf Coast market, changes in recycling processes impacted capacity through part of the quarter. Total volume received in Gulf Coast operations was 771,000 barrels at an average of $12.88 of revenue per barrel.
>
> "Because our capacity was restricted due to process changes for part of the quarter," Cole indicated, "we had to defer certain work during the period, which impacted revenue and operating income. *The market is stronger than our recent results indicate, and the second quarter is off to a better start consistent with an improved outlook*."

85.     On July 25, 2005, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Newpark Resources Reports Increased Second Quarter Earnings on 35%

Revenue Growth," in which the Company reported its financial and operational results for 2Q:05

ending June 30, 2005. The press release stated in relevant part:

> Newpark Resources, Inc. today announced that it earned $4.8 million, or $0.06 per share, during the quarter ended June 30, 2005, compared to net income of $1.3 million, or $0.02 per share, for the same quarter of 2004. Revenue increased 35% to $141.5 million in the 2005 quarter from $104.6 million in last year's quarter.

For the six months ended June 30, 2005, the Company reported net income of $9.7 million, equal to $0.12 per share, which compares to earnings of $2.8 million, or $0.03 per share, in the first six months of 2004. Revenue totaled $270.5 million in the first six months of the current year, an increase of 29% from $208.9 million reported in the same period of 2004.

Drilling Fluids

Jim Cole, Newpark's CEO commented, "Newpark Drilling Fluids is continuing to gain momentum in the marketplace as it penetrates the market, and this is translating into improved earnings and margins for the unit."

\* \* \*

E&P Waste Disposal

U.S. Gulf Coast market revenue from waste disposal increased 9% in the first six months of 2005 to $24.8 million on increased revenue per barrel. Contribution to profit increased 25% to $3.5 million from $2.8 million in 2004. During the second quarter, Gulf Coast revenues increased 15% to $12.8 million, driven by 15% higher average pricing. Operating contribution improved to $2.2 million, or a 17% margin, compared to 9% a year ago. Revenue and operating contribution from non-Gulf Coast markets declined in both the year-to-date and second quarter comparisons.

Commenting on E&P Waste Disposal, Cole said: "We expect that the improving trend in the U.S. Gulf Coast market will continue in the second half of the year, driven by recent activity increases in the inland waters market, which, due to tight environmental regulation, generates the largest volume of waste per rig of all the markets serviced by the company. Meanwhile, we have begun to reallocate resources and management focus, principally away from our non-Gulf Coast operations, to support development of the new water treatment business. Most of the decline in operating contribution outside the Gulf Coast reflects the start-up costs of over $500,000 to date in 2005 borne by those operations."

Water Processing Technology

*Over the past year, Newpark reallocated resources to the development of new market opportunities employing a unique new process technology.*

"*We are very much encouraged by the enthusiasm we have seen in the marketplace and the results achieved thus far in the field,*" said Cole. "In the first U.S. application of the technology, Newpark began processing water associated with natural gas production in the Jonah and Pinedale fields at its Boulder, Wyoming, facility. While still in the start-up and testing phase of our operating plan, we are *producing water meeting the discharge requirements of our permit, and we expect to* begin commercial operation very soon." He continued, "Construction is progressing on the second plant near Gillette, Wyoming, and that facility is expected to be complete late in the third quarter. *Our final objective for the year is to have a test unit in operation in the Canadian oil sands market in the fourth quarter in order to* begin a demonstration of the capabilities of the Armel Activator technology in that important and growing market."

86.     *On November 7, 2005, the Individual Defendants caused or allowed the Company to*

issue a press release entitled "Newpark Resources Reports Third Quarter and Nine Months

- 33 -

Earnings," in which the Company reported its financial and operational results for the 3Q:05 ended

September 30, 2005.  The press release stated in relevant part:

> Newpark Resources, Inc. today announced that, in the third quarter of 2005, it earned net income of $5.0 million equal to $.06 per share, *on revenue of $139.1 million.* This compares to 2004 third quarter net income of $735,000, equal to $0.01 per diluted share, on revenue of $110.8 million.
>
> For the nine months ended September 30, 2005, Newpark earned net income of $14.7 million, equal to $0.17 per share, on revenue of $409.7 million.  This compares to 2004 net income of $3.5 million or $.04 per share, on revenue of $319.7 million.
>
> James D. Cole, Newpark's CEO, stated: "Over the past several years, we have worked to diversify Newpark's revenue base to new markets beyond our historic Gulf *Coast base.  More than half of our revenue now comes from new markets entered as* we diversified the company. ***The profit reported in the recent quarter was earned*** ***from these new markets and points out the progress that we have made*** ***implementing that strategy***."
>
> "Newpark would have earned approximately $0.10 per share in the third quarter, excluding $0.01 of tax benefits, but for the tropical storms in the period which cost us $.05 per share.  Approximately half of that amount should be recovered from business interruption and other insurance in future periods," he continued.  "We expect to demonstrate continuing improvement in earnings in the fourth quarter in spite of the lingering effects of Hurricanes Katrina and Rita.  The Company's Venice, La., facilities have been out of service since the passage of Hurricane Katrina and are expected to remain idled until early next year.  We have *been able to service our customers operations from other Newpark sites pending the* restoration of service.  All other Newpark facilities are operating, although the *Cameron sites damaged by Hurricane Rita are providing only limited services to* drilling fluids and E&P waste customers until repairs currently underway are completed in December.  We anticipate that we will see more activity in that key offshore support market in the first quarter of 2006, as customers return to more normal operating patterns."

87.     On March 6, 2006, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Newpark Resources Reports Full Year and Fourth Quarter 2005

Results," in which the Company reported its financial and operational results for the 4Q:05 and year

ending December 31, 2005.  The press release stated in relevant part:

> Newpark Resources, Inc. today reported net income for the year ended December 31, 2005 of $21.6 million, or $0.25 per common share, on revenue of $557.0 million. This compares to 2004 net income of $4.0 million, or $0.05 per common share, on revenue of $433.4 million.
>
> For the fourth quarter of 2005, Newpark reported net income of $6.9 million or $0.08 per share, on revenue of $147.3 million.  This compares to net income of $526,000 or $0.01 per share, on revenue of $113.7 million in the 2004 quarter. Amounts for 2004 include $4.2 million of non-cash charges, equal to $0.03 per share, affecting both the year and the fourth quarter results.

- 34 -